1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF ALABAMA
2

3   UNITED STATES OF AMERICA
                                  CASE NO. CR15-00088
4   v.
                                  COURTROOM 1A
5   JOHN PATRICK COUCH, M.D.,
    and XIULU RUAN, M.D.,
6                                 MOBILE, ALABAMA
            Defendants.
7                                 SEPTEMBER 1, 2016
    * * * * * * * * * * * * * * *
8

9                    STATUS CONFERENCE
            BEFORE THE HONORABLE SONJA F. BIVINS
10               UNITED STATES MAGISTRATE JUDGE

11  APPEARANCES:

12  FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
13      CHRISTOPHER JOHN BODNAR
        United States Attorney's Office
14      63 S. Royal Street, Suite 600
        Mobile, AL  36602
15      (251) 441-5845

16  FOR THE DEFENDANT COUCH:
        ARTHUR T. POWELL, III
17      P.O. Box 40456
        Mobile, AL 36640-0456
18      (251) 433-8310

19      JACKSON R. SHARMAN, III (via telephone)
        ROBERT JACKSON SEWELL (via telephone)
20      JEFFREY PAUL DOSS (via telephone)
        Lightfoot, Franklin & White
21      400 North 20th Street
        Birmingham, AL  35203
22      (205) 581-0700

23  FOR THE DEFENDANT RUAN:
        DENNIS J. KNIZLEY
24      7 N. Lawrence
        Mobile, AL 36602
25      (251) 432-3799

1    (Continued)

2        JASON BRADLEY DARLEY
         Darley & McGough, LLC
3        1751 Dauphin Street
         Mobile, AL 36604
4        (251) 441-7772

5    THE CLERK:  MARIA PAPP PAYNE

6
                Proceedings recorded electronically,
7          Transcript prepared by official court reporter
            Qualified pursuant to 28 U.S.C. 753(a) & Guide to
8    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
               Transcript produced by computerized stenotype.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    * * *

2        (In open court.)

3             THE CLERK:  We're on the record for a status

4    Conference, criminal case number 15-88-CG-B, United States of

5    America versus John Patrick Couch and Xiulu Ruan.  We have

6    attorneys Doss, Sewell, and Sharman via Phone.  What says the

7    government?

8             MR. BODNAR:  The United States is ready to proceed,

9    Your Honor.

10             THE CLERK:  What says the defendant?

11             MR. SHARMAN:  Ready, ready, Your Honor.

12             THE COURT:  Okay.  This is just a status conference

13    this morning to see exactly where the parties are.  At our last

14    conference I dealt with the motion to continue, and right now

15    the case is still set for jury selection on October 27th.

16    That's actually a special setting.  That's not the normal jury

17    selection date.  But Judge Granade has set this one for October

18    27.

19             After the jury is selected, she'll go right into the

20    trial.  And based on the information that the parties provided

21    back in May, I think she set aside six weeks for this.

22    Basically she's carved out six weeks for this case to be tried,

23    which is why it's pretty important for us to stick to that

24    schedule to the extent possible.

25             Now, the government has issued its expert disclosures;

1    correct?

2              MR. BODNAR:  Yes, Your Honor.

3              THE COURT:  Okay.  And when was that done?  Back in --

4              MR. BODNAR:  I believe it was -- I believe it was

5    mid-July, Your Honor.

6              MS. GRIFFIN:  No.  Mid-June.

7              MR. BODNAR:  Mid-June, mid-June.

8              THE COURT:  Mid-June.  Okay, okay.  And what about

9    Defendant Ruan?  Has he --

10             MR. KNIZLEY:  Defendant Ruan has filed his expert

11   disclosures.

12             THE COURT:  Okay.  And I ex --

13             MR. KNIZLEY:  July 25th, I believe, Your Honor.

14             THE COURT:  Okay.  And I know I extended the date for

15   Defendant Couch to get his in because of the motions that were

16   pending.  Has the government produced all the discovery in the

17   case?

18             MR. BODNAR:  Your Honor, we produced all that we had

19   at the given time.  We have during the course of our

20   investigation, outside our normal prosecution team, realized

21   that there was another district, District of Massachusetts,

22   that had some potentially relevant discovery.  We are in the

23   process right now of getting that ready to turn over.  There

24   are certain HIPAA requirements that we couldn't just turn it

25   flat out over.  We are in the process of doing that as we

1    speak.

2         THE COURT:  Okay.  And what does that --

3         MS. GRIFFIN:  And it's voluminous.

4         MR. BODNAR:  And it's very voluminous.

5         THE COURT:  And what does it relate to?

6    (A discussion was held off the record between government

7    counsel.)

8         MS. GRIFFIN:  All phases of the case, Your Honor.  It

9    relates to the fraud angle and the drug angle and we were

10   provided it by another district.  In fact, it has required the

11   turning over of two hard drives, a hard drive from each

12   defendant, to -- to put it on, it's so voluminous.

13        THE COURT:  But you're not telling me what the records

14   consist of.

15        MS. GRIFFIN:  They are telephone tolls, they are

16   medical records, they are statements of other witnesses.

17        THE COURT:  So --

18        MS. GRIFFIN:  They are --

19        THE COURT:  Okay.  Let's just start with the telephone

20   tolls.  So basically business records relating to who?

21        MS. GRIFFIN:  To coconspirators that were having

22   telephone contact with these defendants.

23        THE COURT:  And the coconspirators are people who've

24   been charged or --

25        MS. GRIFFIN:  No, Your Honor.

1           THE COURT:  Uncharged.  Okay.

2           MS. GRIFFIN:  At this time.

3           THE COURT:  Okay.  And so the telephone toll records

4   you guys didn't know about?

5           MS. GRIFFIN:  We did not subpoena those.  They were

6   not records of our targets, Your Honor.

7           THE COURT:  Okay.  And other than the telephone

8   records, what was the next category?

9           MS. GRIFFIN:  There are bank records, there are checks

10  payable to businesses owned by both of these defendants, there

11  are interviews conducted by agents in other districts, there

12  are interviews conducted by agencies other than the agencies

13  working this case.

14          THE COURT:  Okay.  Hold up one minute.

15          MS. GRIFFIN:  There are some --

16          THE COURT:  Hang on.

17          MS. GRIFFIN:  Excuse me.

18     (A discussion was held off the record between counsel.)

19          THE COURT:  Okay.  The checks paid to businesses owned

20  by these defendants --

21          MS. GRIFFIN:  These defendants, Your Honor.

22          THE COURT:  Okay.  So they would have been checks that

23  I assume would have went through bank accounts of these

24  defendants?

25          MS. GRIFFIN:  They would have been deposits to these

1  defendants, if they were not cashed.  If they were cashed, then
2  we would not have had them in the records we already have.  And
3  plus they were made to -- one was made to a foundation,
4  actually, and one was made to a university that we've now
5  connected to this case that we did not have.
6          THE COURT:  Okay.  And in terms of bank records, how
7  many banks records are we talking?
8          MS. GRIFFIN:  Probably about six different banks.
9          THE COURT:  Okay.
10         MS. GRIFFIN:  We also have some outstanding subpoenas
11  for bank records that we have subpoenaed for bank accounts that
12  are in the defendants' names that we've pushed and pushed to
13  receive and have not received.  But as to the records from the
14  other district, there are interviews of numerous employees of
15  manufacturers and pharmaceutical companies, not interviews of
16  our defendants, but interviews of individuals who mention our
17  defendants.  They culled and sent us everything that mentions
18  either of these defendants and/or their related companies and
19  we have a duty to go through that and make sure there's not
20  HIPAA information pertaining to someone in another district
21  that has nothing to do with this case.
22         THE COURT:  Uh-huh.
23         MS. GRIFFIN:  For example, one of the bank accounts
24  had 3,780 checks that we're having to go through one by one
25  because of the format in which they were presented.  And

1    although we have found four or five checks to these doctors, we

2    can't turn over the records as to people completely unrelated

3    to this case.

4            THE COURT:  So from that account, they would only get

5    four or five records -- of the checks?

6            MS. GRIFFIN:  I think there are probably about 20.

7            THE COURT:  20 checks.  Okay.

8            MS. GRIFFIN:  Probably.  That's just from one bank,

9    though, Your Honor.

10           THE COURT:  Right.  And you say it's about six

11   different banks?

12           MS. GRIFFIN:  Yes.

13           THE COURT:  Okay.

14           MS. GRIFFIN:  So, and then, further, it's basically

15   the complete case file from another district, supplemented by

16   some information they had received from other districts.  And

17   so we're in the process.  And both defense counsel have

18   provided the hard drive.  There's so much information that we

19   cannot put it on disks.

20           THE COURT:  Uh-huh.

21           MS. GRIFFIN:  There would be too many disks to

22   provide.

23           THE COURT:  Okay.  So when are you getting that to

24   them?

25           MS. GRIFFIN:  Your Honor, part of it will probably go

1  the end of next week.  The other part of it will probably be

2  about three more weeks.

3          THE COURT:  Okay.  And none of this is stuff they've

4  already got?

5          MS. GRIFFIN:  They have not, Your Honor.

6          THE COURT:  Okay.  So I'm looking at toll records,

7  some bank records, a couple of statements.

8          MS. GRIFFIN:  It's more than a couple of statements.

9          THE COURT:  How many statements are we talking?

10         MS. GRIFFIN:  Judge, I don't know the exact number,

11 but it's numerous.

12         THE COURT:  Are we talking hundreds or are we talking

13 50?

14         MS. GRIFFIN:  I'd say 50.

15         THE COURT:  Okay.  Okay.  So what else is there?

16 Because to have two hard drives, what you've mentioned so

17 far --

18         MS. GRIFFIN:  There is the complete analysis of all

19 the computers by the FBI.

20         THE COURT:  Uh-huh.  Whose computers?

21         MS. GRIFFIN:  All the computers seized during the

22 search.  There were some computers seized who do not belong --

23 computers that do not belong to these defendants, but they were

24 computers in the businesses that were searched and so they are

25 entitled -- they've had the computers back, but they're

1    entitled to the FBI analyst summary of those as well.

2            THE COURT:  But they've -- it's their own -- it's

3    computers that were under their control?

4            MS. GRIFFIN:  It is, Your Honor.

5            THE COURT:  Okay.

6            MS. GRIFFIN:  It was -- it is under their control.

7    But I think there's some significance in them knowing what we

8    place some emphasis on, rather than them having to go through

9    every single one of those computers.  And in some of the

10   computers we found things that we contend are relevant and we

11   want to provide those in a different format so they know what

12   we are looking at.

13           THE COURT:  Okay.  So you're going to give them the

14   analysis by your computer people?

15           MS. GRIFFIN:  That's correct.  What she calls her

16   reports.  We're also going to provide privileged information

17   that has come from two companies connected with this case, and

18   they are finishing their privilege log that we will be provided

19   to see if we have to have some documents from the privilege

20   log, which would come in under seal.

21           THE COURT:  Uh-huh.

22           MS. GRIFFIN:  So once -- we do not have the privilege

23   log yet from either of those companies.  And the defense has

24   understood going forward that, as we received privileged

25   documents, we've marked them as such and we will ask when those

1    are admitted at the trial, if they are admitted, that they come

2    in under seal.  Obviously the jury would see them.  But we

3    would ask that they remain under seal because some of them

4    contain privileged information that relates to the businesses.

5              THE COURT:  Okay.

6              MS. GRIFFIN:  And there may be some sealed matters,

7    Your Honor, that we are being provided bits and pieces of to

8    verify that there is no producible material in those sealed

9    documents, and those are from other districts.  And that's as

10   much information as I can provide as to that.

11             THE COURT:  So you are being given sealed material and

12   you've got to go through it?

13             MS. GRIFFIN:  To make sure that there's nothing in it

14   that we need to produce in saying there's a summary, in

15   providing a summary of that information.

16             THE COURT:  Okay.

17             MS. GRIFFIN:  Other than the sealed document, which we

18   cannot produce.

19             THE COURT:  Okay.  So you said some of this stuff

20   they'll get the end of next week?

21             MS. GRIFFIN:  Some the end of next week and some

22   probably it will be three weeks, Your Honor.

23             THE COURT:  Why is it -- what's going to take three

24   weeks?

25             MS. GRIFFIN:  Your Honor, because we have to go

1   through each and every piece of it --

2          THE COURT:  Uh-huh.

3          MS. GRIFFIN:  -- and take out what pertains to another

4   district and has no application to this case or this district.

5          THE COURT:  Right.  But what kind of stuff is it that

6   you are going through and how much is it?  I'm trying to figure

7   out why would it take three weeks.  Because when did they give

8   it to you?

9          MS. GRIFFIN:  We received some of it late August.  And

10  I can address that in a sealed ex parte motion as to the

11  lateness of it, Your Honor, if that's necessary.

12         THE COURT:  Yeah, because that might help us figure

13  out why it's going to take three weeks to go through

14  that.  That'll be helpful.

15         MS. GRIFFIN:  Well, it would explain why it's -- why

16  we received it so late.  But going through it, for example,

17  where there are 3,700 checks in a PDF format you have to open

18  each one of them.  You can't just scan down and see if those

19  are checks that are applicable to this case.

20         THE COURT:  But you guys are not doing that.

21         MS. GRIFFIN:  I am.

22         THE COURT:  So y'all don't have paralegals to go

23  through?  Because by the name of some of them, you will be able

24  to tell whether it has anything to do with these defendants,

25  huh?

1          MS. GRIFFIN:  No, Your Honor, we can't.  They are co

2  -- what we contend and what other districts contend are

3  coconspirator records.

4          THE COURT:  Uh-huh.

5          MS. GRIFFIN:  And we want to see if there's telephonic

6  contact, we want to see if they are checks, we want to see if

7  they are hotel records.  And, you know, that's not somebody --

8  something someone can go through who's not familiar with the

9  case.

10          THE COURT:  Uh-huh.

11          MS. GRIFFIN:  We don't have a paralegal assigned to

12  this case.

13          MR. BODNAR:  And, Your Honor, just so you can

14  understand why it's taken so long, why it's so voluminous from

15  this other district, is the way that we requested all this

16  material we wanted to make sure we captured everything possibly

17  discoverable that relates to this case that's involved in these

18  separate cases in other districts.

19          And when they turned it over to us, it's:  Here's all

20  of our checks.  There is Ruan and Couch checks or checks to

21  other foundations that are connected with Ruan and Couch in

22  there.  Or here are all the conversations in which aspects of

23  what we believe that they did and allege that they did were

24  involved and we have to go through and see which witnesses,

25  whether it was before grand jury or interview, actually

1    discussed Ruan and Couch and eliminate all the rest when

2    they're talking about other individuals, particularly with the

3    grand jury material.

4           THE COURT:  Uh-huh.  Okay.  So some -- okay.  So some

5    of it is grand jury material?

6           MR. BODNAR:  Yes, Your Honor.

7           THE COURT:  Okay.  So, and you guys are thinking three

8    weeks you'll have that done?

9           MS. GRIFFIN:  We hope.

10          MR. BODNAR:  That's the hope, Your Honor.

11          MS. GRIFFIN:  That's our intent.  We've been working

12   constantly on it.

13          THE COURT:  Okay, okay.  But this wouldn't relate to

14   any experts or anything such as that?  That's just going

15   through records?

16          MS. GRIFFIN:  It does not, Your Honor, except there's

17   a possibility that one of our nonmedical experts may now be

18   unavailable and so we may have to substitute.  But it will be

19   for a nonmedical expert, and we won't know that probably until

20   the middle of next week.

21          THE COURT:  And would he be testifying to something

22   different than the person who he is substituting?

23          MS. GRIFFIN:  No.  It would just be a different

24   person.  But we still have to provide that notice and provide

25   their CV, Your Honor.

1           THE COURT:  Right.  And so when would you know?

2           MS. GRIFFIN:  Probably the middle of next week.

3           THE COURT:  Okay.  So you need to put them on

4    notice --

5           MS. GRIFFIN:  We will.

6           THE COURT:  -- pretty quickly.  Because it sounds like

7    the testimony is not going to change, just who is rendering the

8    testimony.

9           MS. GRIFFIN:  The gist of the testimony will not

10   change, the gist of the summary of testimony.

11          THE COURT:  Okay.

12          MS. GRIFFIN:  But, Your Honor, we will need, of

13   course, once we receive Dr. Couch's experts, we need time to

14   review that and to decide if we're going to have any motions as

15   a result of that.

16          Further, we have yet to receive reciprocal

17   discovery.  I don't know when to anticipate that, but we also

18   would request time to review and determine if there are any

19   motions that need to be filed on reciprocal discovery.  So I

20   know the Court has given us till September the 25th for

21   motions.  We may need leave of Court, if we determine once we

22   review both of those that we need motions, to file motions out

23   of time.

24          THE COURT:  Well, and I mean, if you can make a

25   showing about, you know, why you were not able to file them by

1    the deadline, the Court allows it.  I mean, if you didn't have

2    the materials in time.

3          And reciprocal discovery, where are the defendants in

4    terms of turning over reciprocal discovery?  That should have

5    happened by now.

6          MR. KNIZLEY:  Judge, as to Dr. Ruan, I think there

7    would not be any other documents at the present time other than

8    what they may have seized already or have in their possession.

9    But that could dramatically change, depending on what the 50

10   witness summaries say that we haven't seen.  And this is in

11   Boston, so that we will have to go to Boston to interview the

12   witnesses, if they are of some importance.  We have no idea who

13   the witnesses are, what the summaries say.  And there could be

14   considerable reciprocal discovery as far as these checks and

15   foundations are concerned.

16          If we're talking about contributions these people may

17   have made to some foundation that we have made a contribution

18   to or requested, you know, that could open a whole new area of

19   need for reciprocal discovery or further investigation.  If

20   there's 3,700 checks and they want to give us 20 or 50 of them,

21   we may want to see what -- there's a protective order in this

22   case already regarding any confidentiality that may be

23   concerned with the checks.  We may want to see what other

24   checks they've got, what impact that could have on this case.

25          The computer analysis is just yet another problem.

1         And we're talking about, at the earliest, getting this
2    on September 21st, if that's three weeks from today, or 22nd.
3    Pretrial motions are due on the 25th.  It's just -- if we talk
4    about toll records, if we're talking about interaction with
5    people in Boston, Massachusetts, starting off with the fact
6    we've already got millions of documents already we're dealing
7    with.  And now they're telling us that in three weeks we're
8    going to have 50 more witness summaries, a number of checks,
9    computer analysis, and phone records -- and when we get those,
10   then we have to react to it.  Then we may get some reciprocal
11   discovery.
12        It's just -- I know the Court has already addressed
13   the issue of continuing this case.  But with this information
14   we're receiving this morning at pretrial conference, though,
15   they have told us they've gotten information and we provided to
16   two hard drives for them to put the information on, we don't
17   have it yet.  And to be dumped on five weeks before trial, with
18   all the millions of documents we have, we can't announce ready
19   for this trial.
20        THE COURT:  Uh-huh.  Okay.  Let me hear from counsel
21   for Defendant Couch.
22        MR. SHARMAN:  God morning, Your Honor.  It's Jack
23   Sharman for Dr. Couch.  And I reiterate what Mr. Knizley said
24   with...(unintelligible).
25        THE COURT:  Okay.  Before you do that, tell me about

1    the reciprocal discovery.  Have you guys produced any?

2          MR. SHARMAN:  We're certainly aware of our obligations

3    in that regard, Your Honor.  And we have -- we have not.  And

4    if there is any to provide, we will, we will do so promptly.

5          THE COURT:  What's promptly?

6          MR. SHARMAN:  As soon as we're aware of any that we

7    have.

8          THE COURT:  What do you mean?  I mean right now?

9          MR. SHARMAN:  Thus far, thus far we're not aware that

10   we have any to produce, which is why we haven't produced any.

11         THE COURT:  Okay.  So you're saying, as far as you

12   know at this point, the defendant has none to produce?

13         MR. SHARMAN:  Yes, ma'am.

14         THE COURT:  Okay.  Was there anything else you wanted

15   to add?

16         MR. SHARMAN:  No, ma'am.  I do share Mr. Knizley's

17   concerns.  And obviously the government can only produce what

18   it gets from other people to produce, and I certainly

19   appreciate the effort that's required to go through that

20   material.  But it does pose some significant problems for us in

21   addition to those that we have previously outlined.

22         MR. KNIZLEY:  Your Honor, you had asked about

23   reciprocal discovery.  And I didn't know if you wanted me to

24   address any other pretrial motions that we would

25   anticipate.  Of course, the Court has considered Dr. Couch's

 1  motion to continue, which we had joined.  It's my understanding
 2  Dr. Couch is going to ask for the district court to review that
 3  unless this Court is willing to review it this morning.
 4          But depending upon what the ultimate outcome of that
 5  is, we would expect Dr. Ruan to file a motion to sever the
 6  case, because if Dr. Couch is going to go to trial with
 7  apparently either no experts or hastily prepared experts, we
 8  think the spillover adverse effect to our alleged coconspirator
 9  and alleged partner in a RICO activity would be very
10  prejudicial to us and we would want to be severed from that
11  case.  And we also think that it creates a -- somewhat of an
12  antagonistic defense, which we would want to entertain the
13  severance motion regarding those two issues, if the case is not
14  continued and Dr. Couch is going to trial without experts or
15  with hastily prepared experts.
16          THE COURT:  Okay.  But your client has retained
17  experts and has submitted expert reports; correct?
18          MR. KNIZLEY:  That's correct.
19          THE COURT:  Okay.
20          MR. KNIZLEY:  However, we're charged in a RICO count
21  and a conspiracy count.  And if -- and there is evidence that
22  the government has produced by email and otherwise that tried
23  to associate us with Dr. Couch's behavior and saying that we
24  had knowledge in a RICO sense and a conspiratorial sense of
25  conduct he had that they think was outside the normal course of

1    medical practice and prescribing medications out of medical

2    necessity.  And if he doesn't have experts to refute that and

3    we are allegedly in a RICO conspiracy with him and we had

4    knowledge of that, that is certainly detrimental to us and we

5    would want to be severed from him at trial.

6          THE COURT:  Okay.  Well, as soon as Judge Granade

7    rules on the motion that's before her, then you'll have a

8    chance to file any motion to sever at that point.  And I'm sure

9    she's probably going to want to take it up sooner rather than

10   later.  It kind of seems like a convoluted argument, but -- go

11   ahead.

12         MR. BODNAR:  Your Honor?  Your Honor, just to clarify,

13   which motion are we talking about that's being considered right

14   at the moment?

15         THE COURT:  I think Defendant Couch has an appeal

16   before Judge Granade --

17         MR. SHARMAN:  And --

18         THE COURT:  -- with respect to the issue about funds.

19         MR. SHARMAN:  Yeah.  And, Your Honor, this is Jack

20   Sharman.

21         THE COURT:  Go ahead.

22         MR. SHARMAN:  This is Jack Sharman again.  And just

23   along the lines that Mr. Knizley and Mr. Bodnar mentioned,

24   Dr. Couch is filing promptly -- that is, probably within the

25   next two hours -- two rule 59 objections, one based on the

1  Court's most recent final order with regard to the asset

2  seizure, and the other with regard to the Court's denial of the

3  motion to continue.  So, as the Court says, those -- those

4  issues should be perfected before Judge Granade and ready for

5  her disposition as she sees fit.

6          THE COURT:  Right.

7          MR. BODNAR:  And, Your Honor, just to put it out

8  there, we will respond to the assets, based on his new motion

9  that's coming out here.

10         THE COURT:  Uh-huh.

11         MR. BODNAR:  With regard to the continuance, it's

12 something that we've discussed at length with both sets of

13 defense attorneys.  We are not in a position to join it.

14 However, we will leave it up to the Court's discretion, because

15 we do understand the potential of Dr. Couch having to go to

16 trial without experts and the possibility of appellate issues

17 that could lead to down the road.

18         THE COURT:  Well, and it sounds like, too, you guys

19 are about to do a document dump on them --

20         MR. BODNAR:  Yes.

21         THE COURT:  -- in three weeks.  So, you know, the

22 other issue, though, is when you were pushing for the October

23 trial date, you went on and on at length about you needed to be

24 able to line up your experts and so, you know, you were asking

25 the Court to schedule that time, carve it out.  Because there's

1   no district judge who can just give you six weeks without any
2   notice and stuff, which is why, you know, when I met with you
3   guys in May I was asking you to forecast.  And at that point
4   you knew what the case -- you knew what the case was looking
5   like, because the last superseding indictment had come down,
6   and you were all on board that you could have this case ready
7   by October.  And so that six-week time was carved out.
8          You know, you can't just willy-nilly think that the
9   district court can come up with six weeks to do a trial of this
10  volume.  I mean, it takes a lot of planning, a special set of
11  jurors being called in because the regular -- we couldn't do it
12  with the regular jury that is already set to come every
13  month.  I mean, it just can't happen.  So to get this case in a
14  posture requires not only planning on the Court's part, but
15  some real planning on the part of the parties as well.
16         MS. GRIFFIN:  And, Your Honor, we are aware of that,
17  as is the defense.  I think we've all worked diligently to try
18  to resolve issues.  We also have advised them that we
19  anticipated matters from other districts.
20         You know, obviously, without stating it, we have no
21  control on when other districts give us matters.  And I think
22  if the Court will allow us to file that ex parte explaining why
23  we received some of the matters late, that this perhaps may
24  shed some light on that matter.
25         MR. BODNAR:  And, Your Honor, there are the two real

1   wild cards that have occurred since May.  And I think

2   everyone -- we had spoke at length, all parties, before May and

3   we did believe that October was the time that we could get it

4   done.  The issues that have come up in between that have kind

5   of thrown a wrench into things are the receiving of material

6   from other districts --

7               THE COURT:  Right.  Because in May you guys didn't

8   tell me anything about we are anticipating materials from

9   another district.

10              MR. BODNAR:  That and the whole issue that's come up

11  with Dr. Couch being unable to obtain experts.  That's not

12  something I -- I'm not going to speak for Mr. Sharman.  But I

13  imagine that's not something he imagined was going to be an

14  issue back in May as well.

15              THE COURT:  I don't know how you get in a case and

16  don't, you know, find out what the client has and

17  everything.  But anyway, so in three weeks the government is

18  going to, as I understand it, produce additional documents.  I

19  hear it's going to be -- you've asked them for two hard drives,

20  but it doesn't sound like to date you know exactly how many.

21              MR. BODNAR:  Well, with two hard drives, that's one

22  for each defendant.  And a lot of the stuff that's going to be

23  on there are the computer summaries of which they have that

24  information already from the computers.  It's going to be --

25  that was the stuff seized by the FBI, copied, and then the

1   computers were returned to them.  That's going to be a large

2   chunk of it.

3        But the bigger chunk that's taking the three weeks is

4   the going through each document from the other district and

5   culling out the stuff that's completely unrelated to our

6   defendants so that we are turning over what is discoverable

7   that we've been produced so we can give it to them.

8        MR. KNIZLEY:  Your Honor, the particulars of what are

9   going to be involved in the -- as Your Honor put it -- the

10  document dump, we knew that they had went to Boston and knew

11  they had interviewed, they had talked to people.  We didn't

12  know exactly what the substance of the new documents or new

13  information -- particularly the 50 witness interviews and toll

14  records and the checks.  But in light of that and then in light

15  of we're talking about three weeks and in light of the Court's

16  concern about simply organizing a six- to eight-week trial,

17  we'd ask the Court to reconsider its Monday ruling and again

18  look at this in light of the fact that it's going to be five

19  weeks from trial that we're going to have a lot of information

20  from a foreign area, from Boston, Massachusetts, with 50

21  witness interviews from that area, that we're going to have to

22  evaluate along with what all we have now.  And again, in light

23  of Dr. Couch's situation, that the Court not wait, but go ahead

24  and revisit -- and I'm asking the Court, moving the Court, to

25  revisit the continuance issue in light of the information that

1  came out in the pretrial conference this morning.

2        Further, Your Honor -- I don't mean to interrupt you.

3  But -- and the government has indicated their position and that

4  they have sent -- they have sent a written version of their

5  position, is that they, as I understand it, do not -- leave it

6  totally to the Court's discretion and are not making any

7  opposition in open court or otherwise to the Court's ruling of

8  continuing the case.  And I don't think that information was

9  available to the Court when the Court made its ruling earlier

10  in the week.

11        THE COURT:  Is the estimated length of the case any

12  different?

13        MS. GRIFFIN:  Probably not.  Six to eight weeks, Your

14  Honor, depending on what the defense intends to put up.

15        MR. BODNAR:  And, Your Honor, it may be time

16  calendar-wise shorter at a different time, because part of

17  November is going to be very choppy, with the election day off

18  or half of election day off, the day before Veterans' Day and

19  Veterans' Day, the Wednesday of Thanksgiving and Thursday and

20  Friday of Thanksgiving.  So it may actually be more condensed

21  schedule-wise if we have weeks straight through to go.

22        MR. KNIZLEY:  Your Honor, if I may add -- we've all

23  discussed this in great detail.  We have the chopped aspect of

24  it.  If it went -- we said six to eight weeks.  Assuming it

25  went seven weeks for trial --

1          THE COURT:  Uh-huh?

2          MR. KNIZLEY:  -- the jury would go out about December

3    20th, and that is just so burdensome on the jury, the eve of

4    Christmas, after an eight-week trial we're asking the jury to

5    start deliberating a very extremely important case to all

6    parties, to the government and certainly to the defendants.

7    And if the trial goes seven weeks, it's December 20th is the

8    day the jury would go out.

9          If it goes longer, it will be into Christmas.  If it

10   goes shorter, it would still...(unintelligible) --

11         THE COURT:  Uh-huh.

12         MR. KNIZLEY:  -- be a verdict at Christmas.  It's just

13   not the right time, in light of everything that's been said,

14   for this case to go to trial.

15         MS. GRIFFIN:  Your Honor, if I might just clarify one

16   matter?  The witness statements that we are reviewing are not

17   all individuals who live in Boston.  In fact, some of them live

18   all over the country.  And, of course, our review of those is

19   twofold, as to whether there is anything exculpatory that must

20   be provided in a summary fashion and to whether there is

21   anything that we would actually use as discovery.  So it may

22   not result in being 50 witnesses, but they are not all in the

23   Boston area.  And we will share with the defense outside of

24   this hearing where we anticipate those witnesses would be

25   located.

1          MR. KNIZLEY:  In other areas of the country?

2     (Unintelligible.)

3          MR. BODNAR:  Yes.

4          THE COURT:  So when will you know which ones you've

5     got to turn over to them?

6          MS. GRIFFIN:  Your Honor, as fast as we are reviewing

7     them.  But to stop and scan them and Bates stamp them --

8          THE COURT:  But the witnesses statements are different

9     than these checks you said you've got to go through one by one?

10          MS. GRIFFIN:  They are, Your Honor.  They are.  And

11     we're in the process of both doing that.  And I can't give a --

12     I know we'll have something by next Friday.  But I don't know

13     if it will be witness statements or not.

14          THE COURT:  And these witness statements, are they

15     just statements or are we talking that you're having to go

16     through grand jury testimony?

17          MS. GRIFFIN:  Both, Your Honor.  And, of course, we

18     can't release other districts' grand jury materials.

19          THE COURT:  Right.  So --

20          MS. GRIFFIN:  So if there were something

21     exculpatory -- and I don't know whether there is or not -- we

22     would get permission in that district to release it as a

23     summary paragraph that we have -- that such and such witness

24     has represented such and such.  I do not know if that exists,

25     however, until we can review those.

1          MR. BODNAR:  And, Your Honor, just so maybe it's

2     easier for you to understand, these witness interviews were

3     not -- none of these individuals were interviewed specifically

4     about Dr. Ruan and Dr. Couch.

5          THE COURT:  Right, right.

6          MR. BODNAR:  They were interviewed about a separate

7     entity for which Dr. Couch and Dr. Ruan in our allegations were

8     intermittently intertwined and therefore references to

9     Dr. Couch and Dr. Ruan or what occurred in Mobile or what

10    occurred with C&R Pharmacy are popping up in these interviews

11    of a separate entity.  That's why each of these has to be gone

12    through.  What was their testimony before the grand jury?  Were

13    they saying anything referencing Ruan, Couch, PPSA, C&R

14    Pharmacy, and so on?

15         THE COURT:  Okay.  So how far along are you through

16    the process of going through all that?

17         MS. GRIFFIN:  We have the three more weeks that I

18    represented to the Court.  I have some that we can get ready

19    for next Friday.  But we still need the three weeks to be able

20    to do the whole -- to be complete with it.

21         THE COURT:  But is that the witness interviews or the

22    bank records?

23         MS. GRIFFIN:  Judge, we haven't broken them up that

24    way.  I could stop doing the bank records and go to the witness

25    interviews and try --

1           THE COURT:  So you're just going back and forth

2   between the two?

3           MS. GRIFFIN:  No.  I started with one thing and I'm

4   going straight down the list.

5           THE COURT:  So, meaning -- you said you're going

6   straight down the list of witness interviews?

7           MS. GRIFFIN:  No, of what we were provided.  What we

8   were provided on the hard drive that was given to us by another

9   district, I'm just going straight down the hard drive.  I can

10  skip around and go to witness interviews.

11          THE COURT:  Because it's not organized?

12          MS. GRIFFIN:  It's organized by bank records, whatever

13  it is.  It's not indexed, however.

14          THE COURT:  So --

15          MS. GRIFFIN:  All the bank records are in one place.

16  All the records from one company are in one file, all the

17  records from another company in one file.  So we can go to

18  that.  But we have a method for going through it, and that's

19  what we're trying to methodically do, so that we comply with

20  our obligations in discovery.

21          THE COURT:  Right.  And I would think, though, that

22  the witness interviews are really -- I mean need to be put at

23  the top of the list, though.  Because if there are witnesses

24  that they need to then try to get in touch with or talk to or

25  whatever --

1          MS. GRIFFIN:  Your Honor, I don't know.  Perhaps some

2     of those witnesses have counsel, so I don't know if they will

3     be able to get in touch with them or not.  But I know that, you

4     know, they certainly would make that effort.

5          THE COURT:  Effort; right, right.

6          MS. GRIFFIN:  But I can't represent to the Court that

7     we can just jump to that.  I will do our best to skip what

8     we're methodically going through --

9          THE COURT:  Yeah, I'm just asking you to put that at

10     the head of the list, the witness interviews.

11          MS. GRIFFIN:  I understand.

12          THE COURT:  Because it sounds like the bank records --

13     you know, it's a lot of records.  But the bulk of them are not

14     going to relate to the defendants, if what you've represented

15     is true, that there is a check here and there's a check there.

16          MS. GRIFFIN:  And we're going through them, Your

17     Honor, and deleting the personal checks where, for example,

18     they paid their child's day care or --

19          THE COURT:  Right.

20          MS. GRIFFIN:  -- and that's just an example -- or they

21     paid, you know, to go eat somewhere.  We're just trying to

22     minimize what they --

23          THE COURT:  Right.

24          MS. GRIFFIN:  -- what we have to provide.

25          THE COURT:  Right.  I understood you guys to say that

1    you've talked about a continuance.  I mean, what are you

2    looking for?

3          MR. KNIZLEY:  Late January --

4          MR. SHARMAN:  Your Honor, this is Jack Sharman for

5    Dr. Couch.  I think, Your Honor, that the discussions we've had

6    have not been so much as to the length, that probably what the

7    government says, I certainly take their word for it, and that

8    the length wouldn't necessarily change, although I do believe

9    if there were a continuance there might be greater opportunity

10   to pare things down, stipulate and so forth, to maybe knock off

11   a little bit of time.  But I assume there's going to be a

12   significant amount of time anyway.

13         I do -- I certainly appreciate exactly what the Court

14   said; that this is a special setting, that six- or seven-week

15   chunks of time do not come cheap for district judges or their

16   staffs or jurors, and that that is a meaningful and significant

17   thing.  I think the consensus or at least the common thread in

18   our discussions is that this case needs to be set at a time

19   where it can be, you know, properly on the track so that the,

20   for example, appellate issues that the government references

21   are either zeroed out or diminished, Mr. Knizley's concern

22   about severance can be assuaged, and we can get in a position

23   of where we have can experts to help us and to deal with the

24   government's experts.  And so it's not -- I think it's not so

25   much a specific calendar date that we were aiming for but,

1      rather, one that allows those goals to be accomplished.

2              MR. KNIZLEY:  Judge, as to -- I don't know if you

3      heard me, but as to specific calendar dates, we have talked

4      among defense counsel and with the government about if the

5      Court did consider continuing the case, that the time frame of

6      starting the case in late January would be the best for all

7      parties concerned.

8              THE COURT:  So would all parties be ready by then?

9              MS. GRIFFIN:  We will, Your Honor.

10             MR. KNIZLEY:  Dr. Ruan will.

11             MR. SHARMAN:  I think Dr. Couch will, Your Honor, if

12     we can get -- you know, if we can -- if we can get these

13     materials from the government that they have received from

14     other places, yes, ma'am.

15             THE COURT:  Well, I'm not promising late January

16     because the time is going to have to be one that Judge Granade

17     would be available.  But I'll sit down with her and go through

18     some of this.

19             So in three weeks the government will have produced

20     everything that you guys know about?

21             MS. GRIFFIN:  Except we have an -- some outstanding

22     subpoenas for bank records.  They are the personal bank records

23     and the business bank records of the defendants.  So they may

24     or may not have those statements.

25             THE COURT:  But, I mean, they could get them.

1        MS. GRIFFIN:  But we still have a duty to produce them

2    as business records.  And some of those we don't have, is why

3    we have to get them.  We don't have the --

4        THE COURT:  Have you already served subpoenas for

5    them?

6        MS. GRIFFIN:  Oh, we have.  And we are pushing them

7    mightily, that we can't wait till the week of trial.

8        THE COURT:  And for the defendants, are there any

9    outstanding documents or anything such as that that you guys

10   are still waiting on?  I know you're waiting to receive what

11   the government has.

12       MR. KNIZLEY:  Right.

13       THE COURT:  And you have no control over --

14       MR. KNIZLEY:  Depending upon what that may be, at this

15   time Dr. Ruan does not have any documents outstanding that we

16   need to give to the government.

17       MR. SHARMAN:  That's the same for Dr. Couch, Your

18   Honor.

19       THE COURT:  Okay.  And what about witness

20   availability?  I mean, have you reached out to your folks?  Is

21   January likely to be as good a time as any?

22       MS. GRIFFIN:  Your Honor, we have not reached out

23   because we -- we did not know.  But, of course, we would do

24   that immediately.

25       THE COURT:  Okay.  So I am going to take the motion

1  for continuance under consideration again, given the

2  government's representations of what's to still be produced to

3  the defendants, and I'll speak with Judge Granade and get an

4  order out.  Okay.

5          MS. GRIFFIN:  Your Honor?

6          THE COURT:  Anything else?

7          MS. GRIFFIN:  Might I inquire, just a few matters?

8          THE COURT:  Uh-huh.

9          MS. GRIFFIN:  Could the parties be advised how many

10  jurors will be in the venire, just for planning purposes?

11          THE COURT:  I'm not sure.

12          MS. GRIFFIN:  Could we get an answer at some point for

13  that?

14          THE COURT:  Yeah.  Well, I'm not thinking that the

15  number is going to be right now much larger than what we would

16  normally bring in.  Are there any concerns?

17          MS. GRIFFIN:  Because -- well, because of the

18  publicity, we may need more jurors than they normally bring for

19  just one jury.  And we need to try to plan some matters based

20  on how many jurors are going to be brought in.  So just at some

21  point in the near future if we could learn, that would be most

22  helpful.  And then --

23          THE COURT:  And with respect to that, if it's a

24  high-publicity case, I think the jury section has a number, you

25  know, that they normally would call in.  But I'll find out

1    exactly what that number is.

2          MS. GRIFFIN:  And, then, we've not discussed it with

3    the defense, but for the United States we would request that

4    our deadline for voir dire questions be two weeks prior to the

5    date of jury selection.

6          THE COURT:  Any objection from the defendants?

7          MS. GRIFFIN:  And, Your Honor, further, if we could

8    have the venire responses two weeks ahead of jury selection?

9    Because -- since there are going to be more than we would

10   normally have for a regular trial, we'd like to have a little

11   additional time to review the jury questionnaires.

12         THE COURT:  I'll see how that works.

13         MR. KNIZLEY:  Dr. Ruan does not have an objection to

14   the two weeks ahead of time submission for jury --

15         MR. SHARMAN:  Nor does Dr. Couch, Your Honor.

16         THE COURT:  Okay.

17         MR. KNIZLEY:  Your Honor, if the Court is inclined to

18   reset the case at a later time, Dr. Ruan would ask that the

19   Court also reset the deadlines for discovery -- disclosures.  I

20   know Dr. Couch has an issue with the expert disclosures.  But I

21   think even among us who are disclosed, there is some cleaning

22   up to do with some disclosures as well.  We'd ask, if the Court

23   is going to reset the case, to reset the deadlines as well.

24         MR. BODNAR:  No objection from the United States.

25         MS. GRIFFIN:  And one last matter from us, Your Honor.

1          THE COURT:  Okay.  Let me see what you're asking in
2     terms of the expert deadline.  Does your client anticipate
3     filing supplemental disclosures?  What are you asking?
4          MR. KNIZLEY:  I think both sides may have that
5     concern, that -- yes.  And we can go with what we have right
6     now.  But we may make some further disclosures, if it was
7     extended somewhat.  And, you know, I think the government and
8     at least Dr. Ruan has agreed there are some other matters that
9     are still outstanding from both sides that we need to get
10    cleaned up before the trial of the case, but no one is
11    complaining about that right now.
12         MR. SHARMAN:  And, Your Honor, this is Jack Sharman
13    for Dr. Couch.  Along those lines, if the Court is thinking
14    along those lines, you know, one option would be that if there
15    were a continuance and a new date, that the parties could be
16    instructed to get together and propose a hopefully agreed-upon
17    proposed amended schedule and submit that to the Court.  That
18    would be one option to take that burden off the Court and also
19    try to get consensus among the parties.
20         THE COURT:  Is the government anticipating that you
21    need to submit supplemental expert disclosures?
22         MS. GRIFFIN:  Just maybe one, Your Honor.  We're not
23    sure on that.  But potentially one.
24         THE COURT:  Okay.  Any other items?
25         MR. KNIZLEY:  No, ma'am.

1          MS. GRIFFIN:  No, Your Honor.

2          MR. SHARMAN:  Not from Dr. Couch, Your Honor.

3          THE COURT:  Okay.  All right.  Thank you all.

4          MS. GRIFFIN:  Thank you.

5          MR. KNIZLEY:  Thank you.

6          MR. BODNAR:  Thank you, Your Honor.

7          MR. SHARMAN:  Thank you, Your Honor.

8       (The hearing ended at 46 minutes, 10 seconds.)

9                              * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    STATE OF ALABAMA)

3    COUNTY OF BALDWIN)

4             I do hereby certify that the above and

5    foregoing transcript of proceedings in the matter

6    aforementioned was recorded electronically under the

7    direction of the United States Magistrate Judge,

8    Southern District of Alabama, and later taken down by me

9    in computerized stenotype and reduced to writing under

10   my personal supervision, and that the foregoing

11   represents a true and correct transcript of the

12   proceedings of said hearing, to the best of my ability.

13

14            I further certify that I am neither of

15   counsel nor of kin to the parties to the action, nor am

16   I in anywise interested in the result of said cause.

17

18            _____s/ Roy Isbell_____9/5/2016_____
                 ROY ISBELL, CCR, RDR, RMR, RPR, CRR
19               ACCR #22
                 COURT REPORTER, NOTARY PUBLIC
20               STATE OF ALABAMA AT LARGE

21   My Commission Expires:  10/7/2017

22   Certified Court Reporter
           Alabama Board of Court Reporters
23   Registered Professional Reporter
     Registered Merit Reporter
24   Registered Diplomate Reporter
     Certified Realtime Reporter
25         National Court Reporters Association

*Roy Isbell, CCR, RDR, CRR, Official Court Reporter*
*113 St. Joseph Street, #231, Mobile, Alabama  36602*